# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | CASE NO. 1:13-CR-44-HSM-WBC |
| ) | |
| GARY WAYNE CLARKSON ) | |
| ) | |

## REPORT and RECOMMEDATION

### I. Introduction

Defendant Gary Wayne Clarkson moves to suppress evidence of a gun found in his houseboat and statements made by him on or about March 24, 2013 to law enforcement officers. [Doc. 20]. For the reasons stated herein, the undersigned RECOMMENDS defendant's motion be GRANTED in part and DENIED in part.

### II. Facts

An evidentiary hearing was held on defendant's motion to suppress on December 3, 2014. Deputy Sgt. Ken Stout and Deputy Brad Harrison of the Rhea County Sheriff's Department and Officer Travis McGee of the Spring City, Tennessee Police Department (SCPD) testified for the government. Private Investigator Dennis Bakkom testified for the defendant. I observed the demeanor of all the witnesses and considered their testimony carefully and conclude that they were all credible. Based on their testimony, I make the following findings of fact:

In March 2013, Travis McGee received a call from the SCPD dispatch that a call had come in from the Spring City Marina to report gunshots fired off a boat at the marina. McGee went to the marina where he met with the complainant, Mr. Morgan, who was the manager of the marina's restaurant. McGee met Morgan at the restaurant on the shore and walked outside with

1

him and stood in front of the dock. Morgan told McGee he had heard the shots come from an orange and white boat, and he pointed in the direction of the dock where defendant's boat was tied. McGee phoned Sgt. Deputy Ken Stout to ask for back-up. Stout phoned Deputies Harrison and Josh Miller of the Rhea County Sheriff's Department to meet him at the marina. Ten to twelve minutes later, Stout, Harrison and Miller met McGee at the marina, and they discussed the situation for a few minutes.

The officers knew which houseboat belonged to defendant and that defendant was a convicted felon because, two to three months prior to this incident, Investigator Rocky Potter of the Rhea County Sheriff's Department had called to inform the deputies that the defendant was a known violent sex offender and had moved into the marina. It is the regular practice of Potter to call the Sheriff's Department to tell the officers when a sex offender has moved into the area.

The officers discussed the fact that defendant was a convicted felon and which houseboat defendant occupied. They proceeded in the direction Morgan had pointed to defendant's houseboat. The houseboat was painted white with some trim and the upper railing painted orange. A large white flag with an orange "T" in the middle hung from the railing. The houseboat was located at end of the dock with one side tied along the dock. Other boats were tied alongside the dock as well. The officers opened an unlocked gate, walked down a long narrow walkway to the end of the dock and stood on the dock next to defendant's boat.

Stout knocked on the side window of defendant's houseboat and received no response. He knocked again and the defendant emerged from the cabin onto the front deck of the boat. Stout told defendant about the report of a gunshot, and defendant denied he had a gun or that he had fired a gun. Stout requested consent to search the boat, and defendant denied it. Stout then told defendant if he did not consent he would try to get a search warrant. At this point, defendant agreed to let the officers search the houseboat. The conversation between the officers and

2

defendant was at all times polite, no voices were raised, no weapons were drawn, defendant was not handcuffed and no threats or promises were made other than the statement that Stout would try to obtain a warrant.

After defendant consented to a search of the boat, he stated he first needed to put up his dogs because they would bite. The officers agreed and defendant put two small dogs in the bathroom. Stout and Miller began to search inside the boat while Harrison and McGee began to look on the deck of the boat. McGhee saw a shell casing which Harrison picked up. Harrison called to the officers and defendant inside the boat that he had found a shell casing. When asked about the shell, defendant stated a boy had fired a gun from the deck some time ago. Harrison, in a deliberate ruse, stated he could still smell the gunpowder on the shell. Defendant then admitted he had fired a rifle from the deck into the water or bank and that he had a rifle in the bathroom. The officers declined defendant's offer to fetch the rifle and, instead, had Eve Clarkson, defendant's ex-wife, remove the dogs from the bathroom whereupon Stout retrieved the rifle. It was loaded and stored inside a soft case. Stout unloaded the rifle and returned it to its case. At that point, everyone walked off the boat, defendant was handcuffed, placed under arrest, and read his *Miranda* warnings. The government concedes that after defendant was placed under arrest but before he was given his *Miranda* warnings, Stout asked defendant where he got the gun and defendant told him he obtained it in Cleveland, Tennessee.

Defendant was transported to jail where Stout gave him a written consent to search form. Stout testified he did not have a written consent to search form with him at the marina, and he asked defendant to sign a written form at the jail to confirm his earlier consent. Stout read the form to the defendant who then signed it. There were no threats or promises made to convince defendant to sign the form. Their conversation was polite, Stout's firearm was holstered, and defendant seemed to understand the form and what he was signing.

Private Investigator Bakkom testified he went to the marina after defendant was arrested and charged in this case, spent several hours there, and took a number of pictures. Based on his testimony and the pictures he took, I conclude it is not possible to see the defendant's boat from the marina's restaurant on the shore nor it is possible to see defendant's boat from the beginning of the dock walkway. However, it does appear that if one were standing in the parking lot close to the water or one of the other docks parallel to the dock where defendant's boat was tied, then one could see defendant's boat. *See* Defendant's Ex. 2.

### III. Discussion

*A. The Houseboat Search*

Defendant first argues that the officers' search of his houseboat which led to the discovery of the rifle in the bathroom violated the Fourth Amendment's stricture against unreasonable searches and seizures. Searches not conducted pursuant to a valid search warrant "are per se unreasonable under the Fourth Amendment - subject to a few specifically established and well- delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978); *Katz v. United States*, 389 U.S. 347 (1967). Valid consent to search a premises is recognized as an exception to the Fourth Amendment's requirement of a search warrant. *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). The government bears the burden of demonstrating that consent was "freely and voluntarily given," without influence of duress, coercion, or mere submission to authority. *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968); *see also, United States v. Cochrane,* 702 F.3d 334, 342 (6th Cir. 2012); *United States v. Worley*, 193 F.3d 380, 385 (6th Cir.1999); *United States v. Van Shutters,* 163 F.3d 331, 335 (6th Cir.1998). That burden must be met by a preponderance of the evidence with clear and positive testimony. *United States v. Hurst,* 228 F.3d 751, 757 (6th Cir. 2000); *Worley*, 193 F.3d at 385; *Van Shutters*, 163 F.3d at 336. The determination of "whether a consent to a search was in fact 'voluntary' or was the product of

4

duress or coercion ... is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *Cochrane*, 702 F.3d at 343.

Police were well within Fourth Amendment boundaries when they walked down the long dock past several other moored boats to reach the defendant's houseboat and knocked on the window while standing on the dock. A police officer may, without reasonable suspicion or probable cause, approach the front door to a residence to knock and ask questions provided the resident has not attempted to block access to the front door or taken other significant measures, such as "No Trespassing" signs, to maintain his privacy. *See Hardesty v. Hamburg Twp.*, 461 F.3d 646, 654 (6th Cir. 2006); *see also*, *United States v. Ventling*, 678 F.2d 63 (8th Cir. 1982) (officer observed and photographed tire tracks after driving into driveway); *United States v. Humphries*, 636 F.2d 1172 (9th Cir. 1980) (officer observed parked car in open view from street and entered driveway to get license number). "Public drives, sidewalks, or walkways (even those which lead to a rear side door) are not within the curtilage of the home when they are not enclosed by a gate or fence." *United States v. French*, 291 F.3d 945, 953 (7th Cir. 2002); (*citing United States v. Evans*, 27 F.3d 1219 (7th Cir.1994)). In this case, Stout and the other officers proceeded down a long walkway used by other boat owners to reach their boats in order to come to defendant's houseboat. There were no "No Trespassing" signs or other indications that the officers were not permitted on the walkway. Once the officers reached defendant's houseboat, Stout could not reach the door to the houseboat from the dock, and he reasonably chose to knock on the window.

After Stout knocked a second time on the window of the houseboat, defendant came to the deck of his boat and engaged in a conversation with police about consent to search his houseboat. He initially declined, but, after Stout told him he would try to get a warrant if defendant refused consent, defendant gave consent. I do not find that Stout's statement was a

5

threat which invalidated the voluntariness of defendant's consent. As the Sixth Circuit explained in *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998):

> It is well-settled that the agent's statements to the effect that he would obtain a warrant if Salvo did not consent to the search does not taint Salvo's consent to a search. In *United States v. Blanco*, 844 F.2d 344, 351 (6th Cir.), *cert. denied*, 486 U.S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988), this Court affirmed a district court's ruling that a consent to search was voluntary, even though the investigating agent informed the suspect that if he refused to sign a search to consent form, the agent would attempt to secure a search warrant. *See also, United States v. Watson,* 117 F.3d 1421, 1997 WL 377035, * 3 (6th Cir.)(unpublished disposition), *cert. denied*, 522 U.S. 961, 118 S.Ct. 393, 139 L.Ed.2d 307 (1997)("Notifying a person that a warrant can be obtained does not render consent involuntary unless the threat to obtain the warrant is baseless.")(citing *United States v. White*, 979 F.2d 539, 542 (7th Cir.1992)("When the expressed intention to obtain a search warrant is genuine ... and not merely a pretext to induce submission, it does not vitiate consent.")); *United States v. Evans,* 27 F.3d 1219, 1231 (7th Cir.1994)(consent to search was not tainted because agents informed consentee that they would obtain a warrant if he would not consent); *United States v. Duran*, 957 F.2d 499, 502 (7th Cir.1992); *United States v. Hummer,* 916 F.2d 186, 190 (4th Cir.1990), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 670, abrogated on other grounds, 96 F.3d 102 (4th Cir.1996)("The fact that a search warrant is mentioned 'does not necessarily constitute a coercive factor negating consent.' ") (quoting *United States v. Vasquez*, 638 F.2d 507, 528–29 (2nd Cir.1980), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981)); *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir.1990)("consent is not likely to be held invalid where an officer tells a defendant that he could obtain a search warrant if the officer had probable cause upon which a warrant could issue"); *United States v. Dennis*, 625 F.2d 782 (8th Cir.1980).
>
> In this case, Agent Williamson testified that prior to going to Salvo's room, he had sufficient information to obtain a search warrant. (Williamson Transcript, p. 41; J.A., p. 64). There is no evidence on the record that the agents' statements that they would secure a search warrant if Salvo did not consent were baseless or a pretext to coerce Salvo, and, therefore, the statements do not render Salvo's consent involuntary.

*Id.* at 954-955; *see also*, *United States v. Holland,* 522 Fed. Appx. 265, 275 (6th Cir. May 24, 2013); *United States v. Jones*, 2009 WL 77449 *48 (E.D. Tenn. Jan. 8, 2009).

In the instant case, the officers had information from the marina restaurant's manager that the shot fired had come from an orange and white boat at the end of the dock. The manager

pointed toward the dock where defendant's boat was moored and defendant's boat was orange and white. Thus, Stout's threat that he would obtain a warrant was not baseless or a mere pretext. Further, it is clear defendant understood his right to refuse consent since he did refuse initially. In addition, the evidence indicates the conversation in which consent was requested was polite, the officers did not draw their guns, and defendant was not under arrest or handcuffed. Based on the totality of the circumstances proven with clear and positive testimony by a preponderance of the evidence, I conclude defendant gave knowing and voluntary consent to search his houseboat. Further, the evidence indicates defendant did not, at any time during the search, withdraw his consent. Thus, the officers' search of his houseboat in which the rifle was found in the bathroom did not violate constitutional standards.

### B. Defendant's Statements

The government stipulated to the Court at the evidentiary hearing that it did not intend to use any statements against defendant that he made after he was removed from the houseboat and taken to the police station. Further, the government conceded defendant's statement about where he obtained his rifle is inadmissible evidence because the statement was made in response to custodial interrogation without the benefit of *Miranda* warnings. Thus, the only statement truly at issue in this motion is defendant's admission that he had shot a rifle into the water or the bank and that the rifle was in the bathroom (herein after referred to as "the admission").

Defendant argues that he was detained at the time he made the admission and that he made the admission in response to Harrison's ruse that he could smell gun powder on the shell casing. Defendant further contends that this ruse was the function equivalent of interrogation and because he had not yet been *Mirandized*, his admission must be suppressed. The government denies that defendant was detained at the time defendant made his admission.

7

Law enforcement have detained a person within the meaning of the Fourth Amendment when they have acted in such a manner that a reasonable person does not feel free to leave. *Myers v. Potter*, 422 F.3d 347, 355 (6th Cir. 2005) (citing *INS v. Delgado*, 466 U.S. 210, 215, (1984)). There are two types of detentions, an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 16 (1968) and a full arrest. *See generally United States v. Jones*, 673 F.3d 497, 503 (6th Cir. 2012) (citing *United States v. Smith*, 594 F.3d 530, 535 (6th Cir.2010)). "In a *Terry* stop, officers may briefly detain a person for investigative purposes so long as it is "'reasonable.'" *United States v. Young,* 707 F.3d 598, 603 (6th Cir. 2012) (citing *Terry*, 392 U.S. at 20–22). An arrest, of course, requires probable cause to believe a crime has been committed. *Id.*

Statements made by a defendant pursuant to express questioning or its functional equivalent while under arrest must be preceded by *Miranda* warnings in order for those statements to be admissible against the defendant. *Dickerson v. United States*, 530 U.S. 428 (2000); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977); *United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995). On the other hand, when a person is not under arrest but is nonetheless subject to a detention pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), he is not entitled to *Miranda* warnings even though police engage in limited questioning. *Berkemer v. McCarty*, 468 U.S. 420, 439-41 (1984); *United States v. Swanson,* 341 F.3d 524, 528–29 (6th Cir.2003) ("The very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights."); *United States v. Thomas*, 142 Fed. Appx. 896, 900-01 (6th Cir. 2005). However, "[w]hen police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause." *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000) (quoting *United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994)). In *United States v. Swanson,* 341 F.3d 524 (6th Cir.

8

2003), the Sixth Circuit set forth the following factors to consider when determining if a *Terry* stop has become an actual arrest:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police ... [or] acquiesced to their requests to answer some questions.

*Id.* at 529 (quoting *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2003)).

In the instant case, I conclude defendant was subject to a detention when the officers were searching his boat because a reasonable person in his position would not have felt free to leave. I further conclude the detention at the time defendant made the admission about the rifle was only a *Terry* stop. At the time defendant made the admission, he was free to move about on his houseboat where he lived, he was not cuffed, and the questions directed at him related to the purpose of the *Terry* stop. Further, the questioning was not hostile and he had been detained for only a short period of time. These factors outweigh the fact that defendant was not told he did not have to make statement. In fact, defendant seemed to understand his rights as illustrated by the fact that when first asked, he refused consent to search the houseboat. Thus, I conclude based on the totality of circumstances that at the time Harrison used the ruse that he smelled gun powder on the shell casing, an unequivocal (and successful) attempt to elicit a statement from defendant, defendant was not entitled to *Miranda* warnings because he was not then under arrest.[1] The officers did not place defendant under arrest until the officers found the rifle and handcuffed the defendant.

---

[1] I also find that, at the very least, the officers had reasonable suspicion to believe that defendant had shot a firearm from his houseboat based on the information obtained minutes earlier from the marina's restaurant manager, thus the very brief, relatively nonintrusive *Terry* stop was reasonable.

Accordingly, it is RECOMMENDED defendant's motion to suppress the admission about the rifle be DENIED. In as much as the government concedes defendant's statement that he obtained the rifle in Cleveland, Tennessee was made in response to a question posed to him after his arrest but before he was *Mirandized*, it is RECOMMENDED that defendant's motion to suppress this statement be GRANTED.

## IV. Conclusion

For the reasons stated herein, it is RECOMMENDED[2] that defendant's motion to suppress be DENIED as to (1) the rifle and (2) any statements made before officers retrieved the rifle from the bathroom. It is RECOMMENDED that his motion to suppress be GRANTED as to any statements defendant made after the officers retrieved the rifle from the bathroom and placed defendant under arrest.

S/*William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).